Okay, the next case on the afternoon docket is Knopp v. Fager, 5-7-2-0-1-6-6. Next that I would, uh, case. I'm sorry, bud. How are you? I'm good, ma'am. How are you? It's a beautiful day. We'll just take my word for it. Okay, when you're ready. Thank you. I'm going to get some water because I get a little dry mouth when I talk. I have some myself. Justices, opposing counsel, please to the court. My name is Winter Campanella. I represent the respondent appellant Miranda Fager. Presented to you today are three issues. The trial court incorrectly construed 602.5 regarding allocation parental responsibility decision making. Issue number two, the trial court incorrectly construed 602.7 regarding allocation of parental responsibility parenting time. And thirdly, the trial court incorrectly denied Ms. Fager's motion to reconsider. I know family law cases are very fact specific. I trust that the justices have read the brief, so I'm not going to belabor the facts. So let's get into issue number one. The award of decision making and parenting time, the statute requires that the court consider best interests of the minor child. In determining best interests, both sections, section 602.5 and section 602.7, list factors that the trial court should consider. And the trial court's determination will not be overturned unless it's against the manifest way to the evidence. And as I'm sure the justices know, our Supreme Court in Enray the Parentage of J.W. determined that a ruling is against the manifest way to the evidence when the opposite conclusion is clearly apparent. And with regard to decision making, the trial court awarded the petitioner sole allocation of parental responsibilities decision making. And that actually was against the manifest way to the evidence. The trial court in its ruling didn't even analyze the case under the correct statute. It analyzed the case under 602.7, which deals with parenting time, not 602.5. And now while both sections are similar, there are some similar factors to consider. They are different sections for a reason, and they do have a lot of differences, and the trial court failed to analyze the case, that particular part of the case, under the correct portion of the law. In analyzing the factors with the facts presented at trial, the court would see that out of the 15 or 14 specified factors in the statute, nine of them favor neither party. One of them favors the father, the petitioner, and four of them favor my client, Miranda. I don't want to belabor the ones that favor neither because my time is limited, but there's a couple of things I do want to bring to the court's attention. With regard to the mental and physical health of the parties, which is subsection, or I'm sorry, subparagraph C3 in 602.5, the trial court kind of dinged my client because she admitted to using marijuana while pregnant once, and she had had postpartum depression, which was treated. She went and sought treatment for it, and actually the trial court should not have considered those factors because 602.5 E, which mirrors 602.7 C, says the trial court is not supposed to consider parental conduct that doesn't affect the relationship with the child. There was no evidence that the relationship between Miranda and the minor child were affected negatively by the fact that Miranda smoked marijuana once while pregnant and that she had postpartum depression that was being treated. What was the order of protection about? When did that happen? The order of protection happened before the first temporary order, and it was Seth testified that he got that order of protection basically to get a leg up in the family case. What did he allege? He alleged that, if I remember correctly, Your Honor, that my client punched him in the head was an allegation of the OP, and eventually, while he was granted the emergency OP, which kept my client and the minor child apart for a month, and my client had been the primary care provider for the minor child for her entire life up to that point, he did this, like I said, he testified because he wanted this OP in order to get a leg up in the family case that he knew was coming, and eventually, the order of protection, while he was granted an emergency order of protection, he dismissed the action once a temporary order was entered in the family case. And did he actually testify and did it to get a leg up? Yes. Counsel, now, the parties entered a temporary order. Did the temporary order provide for supervision? Did your client be supervised with the time of the child? Yes, Your Honor, it did. It provided supervision. At this point in time, my client was living with her father and stepmother, so it wasn't like special supervision with Addis or somebody not familiar to the child, somebody outside of the family. It was just her stepmother and father, and after not seeing your child for a month, one would be desperate to do anything to be able to see their daughter. What was the reason for supervision, and how long did it last? Supervision, I believe it lasted about four months, three months. So it wasn't ongoing all the way through? No, Your Honor, and actually, there was another temporary order entered in June of 2016, whereby my client's parenting time was then unsupervised. And that temporary order in June of 2016 gave the parties joint allocation of parental responsibility decision-making. Ms. Campanella, you stated that the court improperly considered evidence about her past drug use and some postpartum issues, but what about the stepmother's testimony? That was kind of a ding, too, I might say. Yes, Your Honor, I will say that is a ding. Was it appropriate for the court to consider that? No, Your Honor, because there was no evidence that anything stated in the Facebook message that you're referencing affected the child's relationship with my client. And additionally, there was testimony that when my client would receive the minor child on Saturdays, that the child was happy and excited to see her mother, which means any of that negativity that was thrown about my client had not affected the parent-child relationship. What's the motivation for the stepmother on Facebook? Your Honor, I believe that it may have been somewhat of a pride issue. Say it again? Pride? Pride on behalf of the stepmother. She had been listening to negativity from Seth for so long and maybe started to believe in herself, and she felt that she had kind of to appear as if everything was okay. She had this need to express herself to Seth's mother. That's the only thing I can think of. Well, did the stepmother and Miranda have a good relationship? Yeah, and actually the stepmother testified on behalf of Miranda and said that since the drafting of that message, that Facebook message, she has seen great improvement in Miranda since these parties, which the transcript mentions it numerous times, they had a toxic relationship. And once they separated and that relationship was cut off, Miranda improved dramatically. But it appears that Seth and at least the stepmother had a very good relationship, correct? Correct. Even when Miranda was not having a so good relationship with Seth and other people in the family, he seemed to be more aligned with her family. Well, it seemed that her family kind of took him in. And actually one of the points to consider with regard to parenting time is the caretaking responsibilities for 24 months before the filing. And Miranda always had the minor child. Even when the parties fought when they were living together, if they had a scuffle, Seth would go and stay with the Fagers and leave the minor child with Miranda. So they had that, they did have a good relationship. We can't deny that. What about, so they talk about in Florida, Illinois, Seth's family. How supportive are they? Well, there really wasn't, the only evidence of Seth's family being supportive was his mother. His mother testified that, or there was testimony that the mother would see the minor child three to four times a week. The mother was providing, I hate to use the term babysitting services because it's her grandchild, but was watching the minor child on Saturdays. But other than that, there was no evidence presented as to the closeness of Seth's family with the minor child. But however, for Miranda, there was evidence of closeness. They would, Jill would play with the minor child. The minor child would attend Fager family functions. And they were living in the same household as Mr. and Mrs. Fager. All right, so in, like I mentioned before, section 602.5 and 602.7 have a lot of similarities. But the four factors I want to focus on with regard to, these four factors favor Miranda, and there's one factor that favors Seth. All of the rest of them favor no one. Counsel, let's say, correct, you've got four factors favoring your plan for one. I mean, the court doesn't have to keep score, does it? I mean, he weighs, he or she weighs the factors, gives them weight, depending on the assessment of credibility and how they affect the child. Is that not correct? That is correct, Your Honor. However, if you have an overwhelming number of factors that favor one parent and you rule, the trial court rules in favor of another parent, it seems to me that the opposite conclusion would be clearly apparent, and it would be against the manifest weight of the evidence. Especially considering, one, the trial court didn't even analyze under the right statute, and two, some of the provisions that the trial court ruled upon, like with regard to the parenting time, the trial court said that, I'm trying to find which particular section, oh, the interaction and relationship between the child parties and other people that would affect the best interest of the child. The court completely ignored the relationship between the child and the grandparents, and grandparents would be other people that affect the best interest of the child. So I think, while I agree with you, it's not, you know, a check and balance and we have a scale and we weigh it. I think if you look at the whole picture, the fact that the majority of the factors, both in 602.5 and 602.7, the ones that favor either party favor Miranda, and then you look at how the trial court analyzed the facts, the opposite conclusion is clearly apparent. A few things I did want to bring to the court's attention is the... I understand, but if you move from one county to another, is there any basis for that finding on the court? Actually, Your Honor, there is. If Miranda intended to move and continue to live in the Carbondale area, under the Illinois Marriage and Dissolution of Marriage Act, relocation is defined as, south of Chicago, pretty much, is defined as moving 50 miles. That's true. 50 miles as an internet mapping service dictates, so Google Maps or whichever service you wish to use. So if you're going to move 50 miles, you have to file a petition under the new statute? Yes, Your Honor. Thank you. I didn't know that. Yeah, which actually created a... Oh, that's a whole other story. I actually like the new statute because it used to be if you lived in Metropolis, you couldn't move to Paducah, but you could move to Chicago, and that really made no sense. But the adjustment, the child's adjustment to home, school, and community. Seth's mother testified that the minor child was established in Jackson County. The minor child went to school in Jackson County. Both parties were given permission to enroll the minor child in a pre-K program. Both of them did. However, Miranda was the only one that actually had the child go to school while the child was in her physical custody, if you will. Seth did not have the child actually go to school. His excuse for that is, well, it was a full-time pre-K program. Well, so was the one that the minor child was attending with Miranda, but Miranda took it a step further, contacted the pre-K program, and made arrangements for the minor child to attend on a part-time basis. The child's doctors, counselor, school, friends, all in the Jackson County area. So she was more established with her mother than she was with her father. And the trial court just used the basis to rule that particular factor in Seth's favor. Oh, well, he bought a house. He bought a house, and the parties lived there for a matter of months before they separated.  in one particular area. With regard to parenting time, like I said, a lot of the factors are the same. One thing I did want to bring to the court's attention, actually, I'm sorry, has to do more with the allocation of parental responsibility decision-making, but the court can look at this as well with regard to parenting time. The facilitation and encouragement of a relationship with the other parent. Both parties were allowing electronic contact, yes, and that's good. However, Miranda was the only one reaching out further. She would initiate contact. She would send pictures of the minor child doing things while with her to Seth. She was taking it a step further, and that's really the, in all of those things, she was taking it one step further. Thank you. Thank you. You'll have some time to answer questions. Thank you. Good afternoon, Your Honors. My name's Jay Zanton, and I do represent the FLA Seth Knopp. This case, as counsel mentioned, there's a parental responsibility issue and a parenting time issue. If you look at the two statutes, they are substantially dissimilar, and when the trial court really took a look at analyzing the factors, it really came down to two primary factors. And I think one of the things that was noted in the court's order, and I should have counted them because it kept coming up almost paragraph after paragraph, was the word stability. This judge went, I won't say out of his way, but continued to talk about stability. And basically what the court focused on was two areas that are set forth in both 6025 and 602.7, one of them dealing with child's adjustment to home, school, and community, and then the other one dealing with the mental and physical health of all individuals involved. And with regards to the adjustment to home, school, and community, I think what the court was trying to determine at that time of the trial was what was taking place at that time, not that the history didn't matter, but what could the court see as what was happening then, what could the court anticipate would be the stability of the child in the future. And to be real blunt, there was a distinct difference between mom and dad in this case. Dad did buy a house in Flora. It was a place where he had grew up. He had no intention on moving. He was living there. He was surrounded by family. His mother was actively involved in taking care of the child. On the flip side of it, you had mom. And mom was living temporarily with the stepmother and the father, had a job that was some distance from her home where she was living. Dad had a job at Illinois Department of Corrections. He had a basic work schedule and had much better routine availability for the child in terms of stability. It was brought up about. I don't understand. So when he is gone, he was gone for six weeks voluntarily. Correct. He didn't have to go on this tour. How is that stable for a child? Who took care of the child during those six weeks? Well, at that time, he did take that six weeks. Typically, it's a two-week type of situation. During that six weeks, who took care of the child? Mom took care of the child. Without question. During the two weeks in the summer camp period, I assume it was the two of them. Correct. Well, yeah, when he takes those. Who is anticipated to take care of the child? I think mom. I'll just talk about all this family and Dora. What's that about? What was the evidence about how supportive this family is? The aunts and uncles and nieces. Well, their interaction with the family, with the child and the family, is important. What was the testimony about? Pardon? What was the testimony? The testimony was primarily involving the mom, the paternal grandmother, and the relationship that the paternal grandmother had with the child. There wasn't much testimony about all these aunts and uncles that live in the poor area. It's important to have that. I don't disagree with you, to be frank with you, about the trial record. One of the concerns I had when I reviewed the trial record, because I wasn't part of the trial itself, was, quite frankly, on both sides, the lack of evidence that I, quite frankly, thought could have been submitted on both sides. The court was provided a record. They had a day-long trial, but the court was provided evidence that ended up being the record in front of your honors today. The court had to use the evidence that was submitted at that time to try to determine, all right, here's the record I've got. How am I going to rule on this? And made a decision based upon the record that was submitted. So when your honor talks about, you know, where was the evidence for this or evidence for that, to be honest with you, I agree with you. Where was some of the evidence for maybe more relationships with, quite frankly, both sides of the family? Where was the evidence concerning the ability to communicate with one another and discuss things better? Where was that evidence? There wasn't a lot. You were limited. The trial court was limited in scope in terms of the evidence that was submitted. One of the things that I found in this trial record was disturbing, was that it was mentioned earlier, was the communication between the stepmother and the paternal grandmother. And why was that important? I think it was important in the trial court's mind because it confirmed some of the evidence that was provided earlier in the trial when mom and dad are both testifying and there's a lot of he said, she said stuff. Dad is talking about how the mother was acting, overtly yelling, cussing, being very angry all the time. And you could take that for a grain of salt until you get to that particular exhibit, the Facebook post or the Facebook message or email that was submitted by the stepmother to the paternal grandmother. Because in that email or in that communication, it gets into some very detailed things that was said that caused concerns. And one of those concerns, and this goes to the mental health of the mother, and that goes hand in hand with I think what Judge Hartigan kept harping on was the stability. And in that email or in that communication, one of the things that was said was that the mother just hadn't, I guess in effect hadn't adjusted herself to becoming the mother they would hope for. There was just issues. There was anger issues that were admitted by the stepmother. Now you get to the eve of trial, and quite frankly this communication was about nine months before trial. And then you get to, all of a sudden you get to trial and everything is hunky-dory. I think the... Maybe she became the mother they thought she should be. I mean, that is an issue. On the eve of trial, yeah. A lot of things happen on the eve of trial. My point is that Facebook message was nine months prior. Correct. Do we know what precipitated that? Was there any context given? No, it came out of... I think it was more of a... There was some... Yeah. In fact, yeah, there was. There was some concern about some of the things that mom was saying about her home life with the father, and in part with the stepmother. And I think what the stepmother was initially doing was trying to... How? I mean, for us, we have to be confined to the record, essentially. That is part of it. That will be part of the record. Okay, that's fine. That will be part of the record. And basically, what she says is that she was, in effect, kind of defending herself and her husband in terms of the home life that this daughter had. In fact, one of the first things that she says in that communication is that how the mother always said that she had a terrible home life, and then the stepmother says, when in fact she had a very good childhood. Very good childhood. She talked about how the mother kind of distorted the view of herself, her lives, the lives of other people. You don't need to go through everything in the email. I was wondering about the context. That's how it precipitated. I think it was more of a defense mechanism that came up about the fact that she was saying she didn't have a good childhood. I think, again, this comes down to the issue of stability, the record that's before the court, when the court had to make a decision on this. And when you look at just the issues that this mother was going through, had been going through, continued to go through, and then, as I've mentioned, it seems to me on the eve of trial everything is great. I think the court had to determine some credibility, and the court in this case gave much more credibility to the father and I think has the right to determine those credibility issues. But then it was, again, some of it... I hear you talk about stability and the mental health issues, and yet when I look at the court's order, it says on the issue of whether a restriction on parenting time is appropriate, restriction on parenting time, it's not a fact that they would be departed. And then when you look at the threat of physical violence, not a fact that they would be departed, and that includes directives against the child or any other member of the household. Then the next one is the willingness and ability of each parent to place the needs of the child ahead of his or her own needs. That is a factor that is very important. What does the court say? It doesn't favor either party. It's not a factor. He says this is not a factor in favoring either the mother or the father. He didn't consider it. I disagree with that. I think he did consider it. I think when he goes factor by factor in his order, he's going through and saying, okay, I'm reviewing this factor, the record before me, I do not see where this favors either side. That's how he's viewing it. I do think he's saying that Seth's military career is not putting his military career above his child's time, which we understand. And he also puts in that he doesn't serve his country, which is more than I think is important. But is that really what the court should be focused on, is his service to his country, or are we talking best interest of child? One of the things I'm going to say about this order was that I think the court can make comments like that, but I think when you look at the overall order itself, the focus was still on what's in the best interest of this child, whether you want to call it stability or what have you. When you look at what the court looked at, the court looked at, all right, what's the situation that the father has at this time to offer the child, what's the situation that the mother has at this time with regards to the child, whether it's the home life, whether it's time availability, what have you. Then the court also goes into analysis concerning the mental health and the issues that the mother has gone through and quite frankly may have still been going through. And the court has to decide... I think the court said in its order that the evidence at that point, there was some drug use that was more recent. There was much more recent... The record says that she's had past drug usage, some of which were more recent. I think it's marijuana. In paragraph 13 of his order, he actually applauds, in my view, the ability of both parties to work together to establish, in his words, a healthy relationship with the other for the benefit of the other. Why should it be sold to him as opposed to him? And why does that matter? I think when you take a look at the history of this, they went through a time where there was the order of protection for a period of time, supervision. There was the issues concerning how the mother had treated the child at times, how they had tried, the issues concerning their relationship. And I say they, the mother and the father. And you have to understand that the ability to cooperate and communicate with one another goes well beyond just sitting here and having a conversation. It has to include somebody being able to make good decisions and have personal responsibility for themselves to be able to engage in those type of discussions. What the evidence showed in this case was, in all bluntness, you had one side who, quite frankly, had much more stability, and you had the other side that had several issues going on. You can debate whether or not it was more recent or not more recent, but there was a history lesson being given to the judge about where the mother was in terms of some of her, whether it's emotional problems or mental problems. You've got to be able to have that communication. If you don't have personal responsibility in terms of your own actions, your own behavior, your own attitudes, then how is the court going to trust that individual to be able to have, to make good decisions with regards to the child? Okay, thank you very much. Thank you. Thank you, Justices. First, I want to kind of expound on Mr. Zinn's comment with regard to the evidence at trial and kind of the lack thereof, and I want to broadcast out there that I was not Miranda's trial attorney, and I agree that there could have been more brought on behalf of Miranda and perhaps on behalf of Seth as well, but we are limited to the record, so let's focus on the record. With regard to, you know, Justice Cates, you hit it right on the head. With regard to stability, and he's gone for the National Guard, and as a daughter of a veteran, I'm not attacking his service to our country. I think it is admirable that he does that. However, the focus is what's in the best interest of Hazel, not Seth's service in the National Guard. And stability, you know, the opposing counsel mentions, you know, the court focused on stability, stability of the current situation. Well, the current situation at the time, according to the record, was my client works Monday through Friday in Harrisburg, Illinois, at a job where she creates her own schedule, which means she has the ability to place the child's needs above her own. Seth works at the Department of Corrections with a very rigid schedule. I'm sorry, where? I think it may be Pickneyville, but I'm not 100% sure, Your Honor, and I apologize, I don't have that off the top of my head. Yeah, I was just wondering, he gets off at three in the afternoon, and I was wondering what he does for Hazel. Well, I would wonder that too, because it's not in the record. The only thing that's in the record about what he does with his daughter is he goes to the gym, and the daughter goes to the babysitting service at the gym, and he's at the gym three or four days a week. Like, that's the only evidence of what Seth does with his daughter. With regard to Miranda, what she does with the minor child is art projects, they go for walks, they spend time with some farm animals on the bigger property. So there's more evidence as to what Miranda does on her off time, as opposed to what Seth does on his off time. That's actually what we're asking for, joint allocation, parental responsibilities. And the parties have demonstrated that they can jointly parent the minor child, because when that temporary order was entered in June of 2016 until the court's order in January, there were a couple of loopholes, and those of us who've practiced family law know people like to take advantage of loopholes, one of them being Miranda's parenting time was to start Saturday morning. Well, there's no specific time, it just says Saturday morning, and there was never anything brought before the trial court that the parties weren't able to work on a specific time together for Miranda to start exercising her parenting time. Additionally, the temporary order said that the minor child was to be retrieved from her daycare in Heron by Seth, and when she started attending daycare in Carbondale, the parties were able to work together, obviously, because there was never anything brought before the trial court that suggested that the trial court had to intervene. So the parties aren't able to work together, and Ms. Fager is requesting this court reverse the trial court, award the parties joint allocation parental responsibilities, decision making, award Ms. Fager majority parenting time, award Seth every other weekend parenting time that's been awarded to Miranda. Yes, I do. Yes, I do. And if you disagree with me that you can, then I ask the court to remand it back down to Clay County with regard to parenting time. Thank you.